UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| JONIE BAKER, ) | |
| on behalf of C.S.A., A MINOR, ) | |
| ) | |
| Plaintiff, ) | |
| ) | No. 1:11-cv-00592-WTL-DKL |
| vs. ) | |
| ) | |
| MICHAEL J. ASTRUE, ) | |
| Commissioner of Social Security, ) | |
| ) | |
| Defendant. ) | |

## ENTRY ON JUDICIAL REVIEW

Plaintiff Jonie Baker requests judicial review of the final decision of Defendant Michael J. Astrue, Commissioner of the Social Security Administration ("Commissioner"), on behalf of C.S.A., a minor, denying her application for Supplemental Insurance Benefits ("SSI") under XVI of the Social Security Act ("the Act"). The Court now rules as follows.

### I.  PROCEDURAL BACKGROUND

On January 19, 2007, Baker filed an application for SSI on behalf of C.S.A., a child under the age of 18, alleging that C.S.A. became disabled on January 19, 2007, primarily due to attention deficit hyperactive disorder. Baker's applications were denied initially on May 14, 2007, and again on reconsideration on July 24, 2007. Following the denial on reconsideration, Baker requested and received a hearing in front of an Administrative Law Judge ("ALJ"). A hearing, during which Baker was represented by counsel, was held on July 24, 2009. ALJ Stephen E. Davis presided over the hearing. On October 29, 2009, the ALJ issued a decision denying C.S.A. benefits. The Appeals Council denied a request for review on May 10, 2011, after which Baker filed this timely appeal.

## II.     SUBSTANTIVE BACKGROUND

At the time of the hearing, C.S.A. was twelve years old. C.S.A. was ten years old at the time of her alleged onset date of January 19, 2007. On application for benefits, and on subsequent appeals, C.S.A. alleged problems with attention deficit-hyperactive disorder, lazy eye, and kidney condition. Relevant portions of C.S.A's medical records follow.

C.S.A. was observed in the classroom on November 20, 2003. She had great difficulty following along with the teacher, following directions, and sitting still in a one-on-one situation.

On November 21, 2003, an Individual Education Program (IEP) was implemented for C.S.A. C.S.A.'s strengths were listed as being able to do some academic work with extra assistance and staying on task. Concerns were her difficulties in following directions and staying motivated for a task. She had low academic performance, difficulties with social skills, attention difficulties, was overly sensitive to physical problems, and demonstrated poorly developed perceptual-motor and organizational skills for her age. Her visual difficulties were not viewed as affecting her academics. The reviewing committee determined that C.S.A. did not meet the eligibility criteria for special education.

On November 13, 2006, C.S.A. was referred to General Education Intervention because she could not complete homework without guided assistance, needed constant assistance in organizational skills, and failed math in the ISTEP the previous fall. It was recommended that her work be modified to include shorter assignments, have a timer on her desk, and work with a doctor on attention skills.

A psychologist performed an educational evaluation of C.S.A. on January 22 and 29, 2007. This evaluation was ordered to determine the possibility of a learning disability, as C.S.A.'s teachers had expressed concern about her math computation skills. C.S.A. was noted to

be fidgety and restless throughout testing, rarely sitting in her chair and preferring to stand or crawl under the table to answer questions. Some redirection was required to keep her on task during the testing session, but the test results were deemed a valid estimate of her level of functioning. The Woodcock-Johnson Tests of Cognitive Abilities – III was administered and revealed an overall cognitive ability falling within the low average range of global intelligence. The Wechsler Intelligence Scale for Children – IV was also administered and revealed a verbal comprehension index score of 89, a perceptual reasoning index score of 86, a working memory index score of 83, a processing speed index score of 85, and a full scale IQ of 82. These scores are in the low average range.

      A Child Function Report was completed on January 31, 2007. It was noted that C.S.A. had problems seeing and used glasses or contact lenses, had no problem hearing, was not unable to talk, was not limited in her ability to communicate, had limitations in progress in learning, had no physical limitations, had impairments that did not affect her ability to care for herself, and could pay attention. The reviewer was unsure whether C.S.A.'s impairments affected her behavior with other people.

      A Teacher Questionnaire was filled out on March 19, 2007, by C.S.A.'s fourth grade teacher. The teacher noted that C.S.A. had a very serious problem with comprehending and following oral instructions, comprehending and doing math problems, providing organized oral explanations and adequate descriptions, expressing ideas in written form, learning new material, recalling and applying previously learned material, and applying problem-solving skills in class discussions. C.S.A. had a serious problem understanding and participating in class discussions, an obvious problem understanding school and content vocabulary, and a slight

problem reading and/or comprehending written material. It was further noted that standardized tests showed significant below-average performance compared to norm groups and criteria.

Regarding C.S.A.'s ability to attend to and complete tasks, the teacher noted that C.S.A. had a very serious problem, on an hourly basis, focusing long enough to finish an assigned activity or task, carrying out multi-step instructions, organizing her own things or school materials, completing class/homework assignments, completing work accurately without careless mistakes, working without distracting herself or others, and working at a reasonable pace/finishing on time. On a daily basis, C.S.A. had a serious problem paying attention when spoken to directly and refocusing to task when necessary. C.S.A. had a slight problem sustaining attention during play/sports activities and carrying out single-step instructions. In interacting and relating with others, C.S.A. demonstrated obvious problems, on a daily basis, relating experiences and telling stories, introducing and maintaining relevant and appropriate topics of conversation, taking turns in conversation, and using adequate vocabulary and grammar to express thoughts/ideas in general everyday conversation. The teacher noted no problems moving about and manipulating objects, nor with caring for herself.

On April 4, 2007, a Case Conference Summary/IEP/ITP was issued for C.S.A. In this report C.S.A.'s achievement was noted to be slower than average due to low average cognitive ability. She was working below grade level, often refused to complete in-class assignments, and had inconsistent work product. She needed a structured class, clear expectations, and frequent academic support for reteaching and practice. Further, C.S.A. was assessed as being withdrawn, unwilling to engage in academic activities with peers, and displaying immature behavior. Also, attendance had been a serious concern throughout her school career, missing several full and half days of school. The conclusion of the report, however, was that C.S.A. was not eligible for

special education services. On April 10, 2007, C.S.A.'s mother was informed of this decision and informed that regular education placement was most appropriate for her child.

On April 16, 2007, C.S.A. attended a physical examination by the Indiana Department of Family and Social Services Disability Determination Bureau. Her mother alleged that she was applying for SSI benefits due to C.S.A. being a slow learner and having bad kidneys and bad eyes. After treatment for her kidneys and surgery on her eyes, C.S.A.'s mother reported that she no longer had kidney or eye problems. Her major problem was ADHD and being a slow learner. Her mother reported that she often got up and ran around class, did not obey rules, did not follow the teacher, had to be told several times to do certain things, and even with that, had a hard time following commands. Reviewing doctor Dr. Tasneem Majid diagnosed ADHD and lazy eye. A counseling session and behavioral therapy session was recommended, as well as ADD or ADHD medication.

C.S.A. attended a mental status evaluation for Social Security on April 25, 2007. There was no history of psychiatric treatment and C.S.A. was not reported to be taking any medication. Examining physician Dr. Albert H. Fink assessed low average intelligence by history and a GAF of 68.

A Childhood Disability Evaluation Form was completed on April 26, 2007, which deemed C.S.A. to have a severe impairment that did not meet, medically equal, or functionally equal the listings. Regarding the domain evaluations, C.S.A.'s limitations were less than marked in acquiring and using information and marked in attending and completing tasks. She was deemed to have no limitations in interacting and relating with others, moving about and manipulating objects, caring for herself, and her health and physical well-being. These findings were reaffirmed on July 22, 2007, with the exception that the reviewing physician assessed a

less-than-marked limitation in health and physical well-being. On August 14, 2008, it was recommended that C.S.A. be placed in special education due to a learning disability.

On January 9, 2008, C.S.A. was assessed by Dr. John Alessi as having ADHD, Predominantly Inattentive Type, with moderate severity and difficulty concentrating, sitting still, and focusing on tasks. Dr. Alessi prescribed Strattera.

On April 15 and 16, 2008, C.S.A. underwent an educational evaluation. C.S.A. struggled with math but liked reading. She got along well at home with her parents and siblings, and was doing well academically, but she disliked school. The Wechsler Intelligence Scale for Children – IV was administered, and C.S.A. scored a 102 on Verbal Comprehension Index, 100 on Perceptual Reasoning Index, 94 on Working Memory Index, 91 on Processing Speed Index, and a Full Scale IQ of 98. Overall, her cognitive ability was deemed average. On the Woodcock Johnson Tests of Achievement – III, her reading and written language achievement level was rated average, but her mathematics achievement was in the low average range. Parent and teacher ratings of behavior and emotions were inconsistent and did not identify any significant emotional concerns. Ratings did identify concerns with depression at home and learning problems within the school setting.

### III. APPLICABLE STANDARD

To be eligible for SSI, a claimant must have a disability under 42 U.S.C. ' 423. "Disability" means the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment that has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. ' 423(d)(1)(A). The standard is a stringent one. The Act does not contemplate degrees of disability or allow for an award based on partial disability. *See Stephens v. Heckler,* 766 F.2d 284, 285 (7th Cir. 1985).

In determining whether a claimant under the age of eighteen is disabled, the Commissioner employs a three-step sequential analysis. 20 C.F.R. ' 416.924(a). At step one, if the claimant is engaged in substantial gainful activity, she is not disabled, despite her medical condition. 20 C.F.R. ' 416.924(b). At step two, if the claimant does not have a "severe" impairment or a combination of impairments that is "severe," she is not disabled. 20 C.F.R. ' 416.924(c). If the impairment is severe, the analysis proceeds to step three, under which the Commissioner determines whether the claimant=s impairment or combination of impairments meets or medically equals any impairment that appears in the Listing of Impairments or that functionally equals the listings. 20 C.F.R. pt. 404, subpt. P, App. 1. If the claimant has an impairment or combination of impairments that meets, medically equals, or functionally equals the listings and meets the twelve-month duration requirement, the claimant is deemed disabled. 20 C.F.R. ' 416.906.

In determining whether an impairment functionally equals the listings, the ALJ must examine six domains: (1) acquiring and using information; (2) attending and completing tasks; (3) interacting and relating with others; (4) moving about and manipulating objects; (5) caring for oneself; and (6) health and physical well-being. 20 C.F.R. ' 416.926a(b)(1)(i)-(vi). The claimant=s impairment or combination of impairments must result in "marked" limitations in two or more domains or an "extreme"@ limitation in one domain. 20 C.F.R. ' 416.926(a). A "marked" limitation is one that seriously interferes with the claimant's ability to sustain and complete activities. 20 C.F.R. ' 416.926a(e)(2)(i). An "extreme" limitation is one that very seriously interferes with the claimant's ability to sustain and complete activities. 20 C.F.R. ' 416.924a(e)(3)(i).

In reviewing the ALJ's decision, the ALJ's findings of fact are conclusive and must be upheld by this Court "so long as substantial evidence supports them and no error of law occurred." *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001). "Substantial evidence means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion," *id*., and this Court may not reweigh the evidence or substitute its judgment for that of the ALJ. *Overman v. Astrue*, 546 F.3d 456, 462 (7th Cir. 2008). The ALJ "need not evaluate in writing every piece of testimony and evidence submitted." *Carlson v. Shalala,* 999 F.2d 180, 181 (7th Cir. 1993). However, the "ALJ's decision must be based upon consideration of all the relevant evidence." *Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994). The ALJ is required to articulate only a minimal, but legitimate, justification for his acceptance or rejection of specific evidence of disability. *Scheck v. Barnhart*, 357 F.3d 697, 700 (7th Cir. 2004).

## IV.   THE ALJ'S DECISION

Applying the three-step analysis, the ALJ found at step one that C.S.A. had not engaged in substantial gainful activity since January 19, 2007, the application date. At step two, the ALJ determined that C.S.A. had the severe impairment of ADHD. At step three of the analysis, the ALJ determined C.S.A. did not have an impairment or combination of impairments that met, medically equaled, or functionally equaled the listings. The ALJ determined that C.S.A. had a less-than-marked limitation in acquiring and using information and a marked limitation in attending and completing tasks, but no other limitations. The ALJ found that this was not enough to satisfy the criteria at step three and accordingly denied the claim.

## V. DISCUSSION

### A. Assessment of Testimonial Evidence under SSR96-7p

Baker argues that the ALJ's credibility analysis pursuant to SSR 96-7p was in error because the ALJ failed to properly assess the type, dosage, effectiveness, and side effects of medication that C.S.A. took. The Commissioner argues that, even if this were error, it was harmless.

When assessing whether a claimant has an impairment that functionally equals the listings, an ALJ must determine the claimant's degree of limitation in each of six functional domains by considering the claimant's symptoms and the extent to which these symptoms are consistent with the objective medical evidence and other evidence. In considering the claimant's symptoms, the ALJ follows a two-step process. At step one, the ALJ determines whether there is an underlying medically determinable physical or mental impairment that could reasonably be expected to produce the claimant's pain or other symptoms. At step two, the ALJ evaluates the intensity, persistence, and limiting effects of the claimant's symptoms to determine the extent to which they limit the claimant's ability to do basic activities. For this purposes, whenever statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence, the ALJ must make a finding on the credibility of the statements based on a consideration of the entire case record.

An ALJ's assessment of the claimant's credibility is entitled to special deference and is not grounds for reversal and remand unless it is "patently wrong." *E.g.*, *Craft v. Astrue*, 539 F.3d 668, 678 (7th Cir. 2008). Social Security Ruling 96-7p provides seven factors that an ALJ may consider with respect to his credibility determination: the individual's daily activities; the location, duration, frequency, and intensity of the individual's pain or other symptoms; factors

that precipitate and aggravate the symptoms; the type, dosage, effectiveness, and side effects of medication the individual takes or has taken to alleviate pain or other symptoms; treatment, other than medication, the individual receives or has received for relief of pain or other symptoms; any measures other than treatment the individual uses or has used to relieve pain or other symptoms; and any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.  In assessing the credibility of the claimant, the ALJ need not cite findings on every factor provided in 96-7p, but the ALJ must articulate the reasons for his decision in such a way as to "make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." *Brindisi v. Barnhart*, 315 F.3d 783, 787-88 (7th Cir. 2003) (citing SSR 96-7p).

      Here, Baker asserts that the ALJ erred in his consideration of the factor regarding type, dosage, effectiveness, and side effects of medication C.S.A. took. The ALJ concluded that "the claimant's use of medications does not suggest the presence of an impairment which is more limiting than found in this decision," because "there have been significant periods of time since the alleged onset date during which the claimant has not taken any medications." This conclusion was error, Baker argues, because the ALJ failed to consider Baker's testimony that C.S.A. did not take her medication because it made her vomit.

      "Although a history of sporadic treatment or the failure to follow a treatment plan can undermine a claimant's credibility, an ALJ must first explore the claimant's reasons for the lack of medical care before drawing a negative inference. . . . An ALJ may need to 'question the individual at the administrative proceeding in order to determine whether there are good reasons the individual does not seek medical treatment or does not pursue treatment in a consistent manner.' . . . The claimant's 'good reasons' may include an inability to afford treatment,

10

ineffectiveness of further treatment, or intolerable side effects." *Shauger v. Astrue*, 675 F.3d 690, 696 (7th Cir. 2012)(citations omitted). Here, the ALJ did not consider alternative explanations for why C.S.A. did not take medication before drawing the negative inference that C.S.A.'s ADHD did not functionally equal the listings. In this way, the ALJ ran afoul of SSR 96-7p. However, the Court finds that the error was harmless. The ALJ specifically addressed each factor in his credibility analysis. For example, the ALJ analyzed in detail C.S.A.'s allegations regarding location, duration, frequency, and intensity of her symptoms against her longitudinal medical history, before finding her allegations unsupported by the record. Given the analysis the ALJ engaged in with respect to the SSR 96-7p factors, the Court finds that proper consideration of alternative explanations with respect to this single factor would not have changed the outcome.

### B. Assessment of Childhood Listings of Functional Equivalence

Baker also asserts that the ALJ erred when he failed to discuss Listing 112.11, its implications, and relevant evidence. Further, Baker argues that "the decision mentions the six childhood domains of functional equivalence that are to be evaluated, however, the ALJ never solicited evidence regarding these domains at the hearing." Finally, Baker argues that the ALJ's decision was less than fully informed because no psychological expert was present at the hearing to testifying regarding the evidence as it relates to the domains.

With regard to whether C.S.A. met Listing 112.11, the ALJ clearly addressed the listing, its requirements and implications, and the relevant evidence. The ALJ acknowledged that, pursuant to 112.11(B), in order to meet this listing, a claimant must demonstrate marked impairment in at least two of the following: age-appropriate cognitive/communicative function, age-appropriate social functioning, age-appropriate personal functioning, or marked difficulties in maintaining concentration, persistence or pace. For his analysis on C.S.A.'s abilities to

function in these areas, the ALJ referred to his later analysis regarding whether C.S.A.'s ADHD functionally equaled the listings. Given the near total overlap between the criteria for meeting 112.11 or functionally equaling a listing with respect to ADHD, it was not error for the ALJ to do so. Furthermore, the ALJ's analysis with respect to whether C.S.A. functionally equaled a listing was detailed and thorough, building an accurate and logical bridge to his conclusion.

Baker's assertion that the ALJ did not solicit evidence regarding any of the criteria of Listing 112.11 at the hearing is simply incorrect. The following is a list of the just some of the questions the ALJ asked at the hearing:

1. "[Does C.S.A.] give[ ] you a, a hard time getting dressed for school?"
2. "Does she dress herself during the school year?"
3. "Are there particular chores that you have kind of assigned to her to do on a regular basis?"
4. "How does she get along with her other siblings?"
5. "Does she have friends in the neighborhood that she plays with? "What kinds of things do they do? "
6. "Does she do any reading on her own?"
7. "Will [C.S.A] stayed seated at the table for dinner?"
8. "You talked about counseling at Quincoe, and you said she completed it? Does that mean you had her in counseling for, like, a specific timeframe there, or some kind of [inaudible] program or something, or what, what was that about?"
9. "Is she able to stay home at all on her own?"
10. "If she's outside and has a, a timeline to come back in, does she have a watch or something where she can keep track of the time and know when to return home?"

Finally, Baker's argument that the ALJ erred by not calling a psychological expert is without merit. An ALJ's decision to call a medical expert is discretionary. 20 C.F.R. § 416.927(e)(2)(iii). "If the ALJ believes that he lacks sufficient evidence to make a decision, he must adequately develop the record, and, if necessary, obtain expert opinions." *Clifford v. Apfel*,

12

227 F.3d 863 (7th Cir. 2000). Baker has not asserted any reason why she believes it was error for the ALJ to fail to call a psychological expert. Finding no reason itself, the Court finds that the ALJ's decision was not in error in this respect.

### C. Lack of Substantial Evidence to Support the ALJ's Functional Equivalence Determination

Finally, Baker argues that the ALJ's decision was not supported by substantial evidence because the ALJ overlooked key medical evidence.

Although an ALJ must articulate his analysis of the evidence in his decision, he "is not required to address every piece of evidence or testimony," but must "provide some glimpse into [his] reasoning . . . [and] build an accurate and logical bridge from the evidence to [his] conclusion." *Scheck v. Barnhart*, 357 F.3d 697, 700 (7th Cir. 2004). Therefore, as long as the ALJ's reasoning behind his decision is logical and clear, the ALJ has not erred simply by not explicitly discussing every piece of evidence.

According to Baker, the ALJ failed to consider a teacher questionnaire completed on March 19, 2007, by C.S.A.'s fourth grade teacher. However, it is clear that the ALJ considered the evidence in this record with respect to several different aspects of his analysis, including the location, duration, frequency and intensity of C.S.A.'s symptoms, her ability to acquire and use information, and her ability to attend to and complete tasks. It is true that the ALJ gave this report less weigh because it was completed after "approximately three weeks" of contact with C.S.A. and because it was inconsistent with medical record evidence dated merely one month later, but Baker does not assert, and the Court does not find, that the weight the ALJ gave this report was in error.

It is unclear the significance of the remaining evidence that Baker asserts the ALJ ignored. These records indicate that C.S.A. had difficult following along with the teacher, following directions, and completing homework without assistance in 2003. The ALJ accepted and acknowledged C.S.A.'s limitations during this time – "The school psychologist, Mr. Nelson, Ed.S., noted that the claimant . . . had behavior and emotions indicative of attention problems causing school difficulties and suggested further evaluation by a case conference committee" – and then put these records in context given more recent school reports. Citation to additional records would be duplicative of evidence the ALJ had already accepted, discussed, and considered. Therefore, the ALJ's decision was supported by substantial evidence and must be upheld.

## VI.   CONCLUSION

The ALJ fulfilled his obligation to build a clear and logical bridge from the evidence to his conclusion and his conclusion is supported by substantial evidence. Accordingly, the decision of the Commissioner is AFFIRMED.

SO ORDERED:  08/31/2012

*William T. Lawrence*

Hon. William T. Lawrence, Judge
United States District Court
Southern District of Indiana

Copies to all counsel of record via electronic communication.